UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

ANSHUMAN BHATIA,

                              Plaintiff,

        -against-                                        **COMPLAINT**

THE CITY OF NEW YORK; JOSEPH COYE, FORMER              **Index No.**
PEACE OFFICER OF THE NEW YORK CITY
DEPARTMENT OF HOMELESS SERVICES ("DHS"), DHS
PEACE OFFICER IAN BOURNE, and DHS LIEUTENANT
ROBERT DIAZ,

                              Defendants.

------------------------------------------------------------------------X

        Plaintiff ANSHUMAN BHATIA, by his attorney, Gideon Orion Oliver, hereby

complains of Defendants as follows:

## <u>JURISDICTION AND VENUE</u>

        1.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983, the First, Fourth, Fifth,

Sixth, and Fourteenth Amendments to the United States Constitution, and New York law.

        2.      This Court has jurisdiction over Plaintiff's federal civil rights claims herein

pursuant to 28 U.S.C. §§ 1331 and 1343, and over Plaintiff's New York law-based claims under

28 U.S.C. § 1367.

        3.      The Federal Declaratory Judgment Act, 28 USC §§ 2201 and 2202, authorizes

this Court to grant Plaintiff the declaratory relief Plaintiff prays for herein.

        4.      Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.,* in the Southern District of

New York, where Defendant City of New York has offices, and the actions complained of herein

occurred.

1

## GENERAL MUNICIPAL LAW COMPLIANCE

5.      Plaintiff timely served a Notice of Claim on the municipal Defendant on October 10, 2020.

6.      Plaintiff participated in a hearing pursuant to New York General Municipal Law Section 50-h on February 22, 2021.

7.      Plaintiff has otherwise complied with all conditions precedent to commencing an action under New York law.

8.      At least thirty days have elapsed since service of Plaintiff's Notice of Claim and adjustment and payment thereof has been neglected or refused.

9.      Plaintiff has initiated this action within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York State Law.

## PARTIES

10.      At all relevant times mentioned herein, Plaintiff ANSHUMAN BHATIA (Mr. Bhatia, he/him) was a resident of Queens County in the City and State of New York.

11.      At all relevant times mentioned herein, Defendant City of New York ("New York City" or "NYC") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Department of Homeless Services ("DHS") and DHS employees, including members of the DHS Police Department ("DHSPD").

12.      At all times hereinafter mentioned, except as otherwise stated, Defendants FORMER DHS OFFICER JOHN COYE, DHS PEACE OFFICER IAN BOURNE, and DHS LIEUTENANT ROBERT DIAZ (the "Individual Defendants") were employees of Defendant

City working for DHS who violated Plaintiff's rights, as set forth and described more fully below.

13.    At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

14.    Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

15.    Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

16.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

17.    At all times relevant herein, and as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

18.    Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the

NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

## STATEMENT OF FACTS

19.      The COVID-19 pandemic struck the globe in early 2020.

20.      Also in early 2020, federal, state, and local governments struggled to respond to the pandemic's first wave, including by mandating social distancing and mask-wearing.

21.      For example, at the New York City level, upon information and belief, on April 3, 2020, a citywide directive for wearing masks was issued to all DHSPD personnel.

22.      By way of additional example, on the New York State level, on April 12, 2020, the then-Governor issued Executive Order No. 202.16[1], requiring that all employees present in the workplaces of essential businesses or entities "shall be provided and shall wear face coverings when in direct contact with customers or members of the public" and that "[b]usinesses must provide, at their expense, such face coverings for their employees."

23.      Then, on April 15, 2020, the then-Governor issued Executive Order 202.17[2], mandating mask-wearing in public places when social distancing was not maintained.

24.      On April 17, 2020, the New York State Department of Health ("NYSDOH") issued Interim Guidance on Executive Orders 202.17 and 202.18 Requiring Face Coverings in

---

[1] Executive Order No. 202.16 is available online at https://www.governor.ny.gov/sites/default/files/atoms/files/EO_202.16_final.pdf (last accessed October 6, 2021).
[2] Executive Order 202.17 is available online at https://www.governor.ny.gov/sites/default/files/atoms/files/EO_202.17.pdf (last accessed October 6, 2021).

Public During the COVID-19 Outbreak[3] (the "NYSDOH Interim Guidance"), which explained that

> For all essential businesses or entities, any employees who are present in the workplace shall be provided and shall wear face coverings when in direct contact with customers or members of the public….Individuals must procure, fashion, or otherwise obtain face coverings and wear such coverings when they are in public and are: within six feet of distance from other individuals; in a situation or setting where they are unable to maintain six feet of distance from other individuals; or in a public or private transportation carrier or for-hire vehicle.

25. Upon information and belief, there was no separate DHS policy developed related to safety procedures to be followed by DHS officers – including DHSPD officers - in interacting with the public.

26. Upon information and belief, DHSPD were meant to follow State and City directives regarding COVID.

27. On May 6, 2020, the New York City Human Resources Administration ("HRA") issued guidance related to "Face Covering at HRA Locations During COVID-19", HRA Policy Bulletin #2020-023 (the "HRA Guidance"), which also pertained to DHS staff.

28. Among other things, the May 6, 220 HRA Guidance repeated the information in the April 17, 2020 NYSDOH Interim Guidance.

29. Despite the federal and local orders and guidance, by July 12, 2020, the fact that Defendant City's law enforcement officers were not complying with mask mandates and guidance had become a serious problem and a matter of public concern. For example, on July 22, 2020, *Gothamist* reported:

---

[3] Interim Guidance on Executive Orders 202.17 and 202.18 Requiring Face Coverings in Public During the COVID-19 Outbreak is available online at http://dmna.ny.gov/covid19/docs/all/DOH_COVID19_EO20217-20218PublicFaceCovering_041720.pdf (last accessed October 6, 2021).

> Officers across the city have repeatedly been seen without wearing masks, even when coming into close contact with people during arrests. On social media, there are crowd-sourcing efforts to document officers without masks. The NYPD, which is a separate law enforcement agency from the DHS officers, has dismissed the criticism, blaming the heat, long hours, and riot helmets.

Pereira, Sydney, "Homeless Services Cop Allegedly Cuffed And Detained Man For Photographing Him Without Mask." *Gothamist*, July 22, 2020. Available at https://gothamist.com/news/homeless-services-cop-detained-man-taking-photo-him-without-mask. Last accessed October 7, 2021.

30.     At around 8:15PM on July 12, 2020, Plaintiff Anshuman Bhatia was walking by a hotel located at 23-15 39th Avenue in Queens, New York, which DHS was utilizing as an emergency shelter.

31.     In front of that hotel, Mr. Bhatia noticed DEFENDANT JOSEPH COYE, who was then a DHSPD Peace Officer, standing on the public sidewalk within six feet of passerby, in uniform, without a mask on.

32.     What happened in the next minutes, leading up to and including Mr. Bhatia's arrest, was largely captured on surveillance footage, copies of which Mr. Bhatia received as a result of a Freedom of Information Law ("FOIL") request to DHS.

33.     Some of that surveillance footage was published by *Patch* accompanying an article by Maya Kaufman on September 15, 2020 (the "*Patch* Article")[4].

34.     A compilation of that surveillance footage from two different angles outside the hotel (the "Outside Video") is available online here:

---

[4] *See* Kaufman, Maya. "WATCH: Homeless Services Cops Cuff LIC Man Who Photographed Them." *Patch*, September 15, 2020. Available at https://patch.com/new-york/astoria-long-island-city/watch-homeless-services-cops-cuff-lic-man-who-photographed-them. Last accessed October 7, 2021.

https://www.youtube.com/watch?v=_VL1mMXg10w. Plaintiff incorporates the Outside Video

by reference as a part of this pleading.

35.     After observing Defendant Coye without his mask on, Mr. Bhatia took this picture

of Defendant Coye from several feet away:



36.     On the angle of the Outside Video captured at 0:00-1:55, Mr. Bhatia can be seen

entering the frame from the right, taking a picture of Defendant Coye around 0:15, and arrested

at around 1:25.

37.     1:55 and on of the Outside Video captures the same scene from a second angle.

38.     After taking the above picture of Defendant Coye, Mr. Bhatia began to move on,

intending to leave.

39.     However, Defendant Coye responded aggressively to Mr. Bhatia's having taken

the picture.

40.     For example, Defendant Coye asked Mr. Bhatia confrontationally, in sum, why

Mr. Bhatia was taking the picture, and implied it was not Mr. Bhatia's right to do so.

41.     At 1:59 (which corresponds to around 0:20 from the first angle) Mr. Bhatia can be seen stopping after Defendant Coye's hostile response to Mr. Bhatia's taking his picture.

42.     Mr. Bhatia responded in sum that officers were required to wear masks at that time due to the COVID-19 pandemic.

43.     Defendant Coye replied in substance that he was just outside and had no reason to wear a mask.

44.     At around that time, Defendant DHSPD Peace Officer Ian Bourne emerged from the hotel. *See, e.g.,* Outside Video 2:22.

45.     Like Defendant Coye, Defendant Bourne was also not wearing a mask.

46.     Defendant Bourne walked up the steps, arriving at the sidewalk where Mr. Bhatia and Defendant Coye were interacting a few seconds later. *See, e.g.,* Outside Video 2:22-2:43.

47.     Mr. Bhatia and Defendant Coye continued to speak for a few more seconds.

48.     Next, Mr. Bhatia started to take Defendant Bourne's picture, but was unsuccessful. Defendant Bourne began to put on his mask. *See, e.g.,* Outside Video 2:50.

49.     As Mr. Bhatia then went to leave, as he had begun to do before Defendant Coye engaged him verbally, Defendant Coye then came over and began to physically arrest Mr. Bhatia. *See, e.g.,* Outside Video 2:57.

50.     Defendant Bourne then assisted Defendant Coye in physically detaining and handcuffing Mr. Bhatia. *See, e.g.,* Outside Video 2:50-3:14.

51.     Defendants Bourne and Coye were aggressive in arresting and rear-cuffing on Mr. Bhatia. *See, e.g., id.*

52.     For example, Defendant Bourne raised Mr. Bhatia's arm over his head in an unnecessary and painful manner while putting the handcuffs on. *See, e.g., id.*

53.     After they had placed him in handcuffs, Defendants Coye and Bourne then took Mr. Bhatia inside the hotel.

54.     Once inside the hotel, Defendants Coye and another DHSPD member – not Bourne - then transported Mr. Bhatia in an elevator to an upper floor.

55.     On that upper floor, Defendants Coye and LIEUTENANT ROBERT DIAZ, Defendant Coye's supervisor, further detained, then searched, Mr. Bhatia and his telephone.

56.     *Patch* published a second video depicting the events on that upper floor (the "Inside Video"), a copy of which is available online at: https://youtu.be/RHU-OWX0yi4 (last accessed October 7, 2021). Plaintiff incorporates the Inside Video by reference as a part of this pleading.

57.     The Inside Video begins with Defendant Diaz locking opening the door to a small room with a bench in it. *See* Inside Video, 0:18-0:40.

58.     Defendants Coye and Diaz then placed Mr. Bhatia into that small room with a bench in it. *See* Inside Video, 0:40-0:50.

59.     There Defendant Coye handcuffed Mr. Bhatia's leg to the bench. *See* Inside Video, 0:50-1:00.

60.     Defendant Coye then exited the small room into the adjacent hallway, where he and Defendant Diaz had a conversation about Mr. Bhatia's arrest. *See* Inside Video, 1:00-1:45.

61.     While in the hallway, Defendant Coye appears to act out events to Defendant Diaz. *See, e.g., id.*

62.     Defendant Diaz then instructed Defendant Coye to remove the handcuffs from Mr. Bhatia and search Mr. Bhatia.

63.     Under Defendant Diaz's supervision, Defendant Coye then aggressively searched Mr. Bhatia's person and property, removed Mr. Bhatia's mask, and attempted to unlock and access Mr. Bhatia's phone without his consent. *See, e.g.,* Inside Video 1:49, *et seq*.

64.     First, the Inside Video shows Defendant Coye searching Mr. Bhatia's pockets for and removing his phone. Inside Video 1:49-2:00.

65.     Over the next four or so minutes, as Defendant Diaz looked on in the doorway and supervised, Defendant Coye aggressively searched Mr. Bhatia's person, backpack, and other property. *See, e.g.,* Inside Video 2:00-6:45.

66.     Defendant Coye took off Mr. Bhatia's  shoes and belt and searched Mr. Bhatia's pockets and body.

67.     Defendant Coye removed the handcuffs from Mr. Bhatia to take off Mr. Bhatia's backpack, then re-applied the handcuffs such that they were tight on Mr. Bhatia's wrists.

68.     Defendant Coye then searched Mr. Bhatia's backpack.

69.     Defendant Coye removed the contents of Mr. Bhatia's pockets and backpack and put them on the bench and floor.

70.     Defendant Coye then took Mr. Bhatia's identification, apparently reading information from Mr. Bhatia's identification over Defendant Coye's handheld radio. *See, e.g.,* Inside Video 6:35-6:45.

71.     Defendant Coye then removed Mr. Bhatia's mask from his face and placed Mr. Bhatia's cell phone in front of his unmasked face in an attempt to utilize the phone's facial recognition feature to unlock and further search the phone. *See, e.g.,* Inside Video 6:45-7:23.

72.     Defendant Coye then made some homophobic remarks to Mr. Bhatia along the lines that he was confused why Mr. Bhatia would be taking pictures of men when there were so

many attractive women out there, although his chances of getting laid were slim to none anyways.

73.     Upon information and belief, Defendant Diaz then instructed Defendant Coye to swear out a criminal court summons or "C-Summons" charging Mr. Bhatia with a violation of New York Penal Law ("PL") § 240.26(1) (Harassment in the Second Degree).

74.     Under PL § 240.26(1), a person commits the violation of Harassment in the Second Degree when, with "intent to harass, annoy or alarm another person: 1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same." PL § 240.26(1).

75.     A few minutes later, Defendant Coye left Defendant Diaz watching Mr. Bhatia as Defendant Coye went into a nearby room. *See, e.g.,* Inside Video 10:15-10:45.

76.     When Defendant Coye emerged from the nearby room, he was holding a Criminal Court Summons or "C-Summons" that he had sworn out against Mr. Bhatia.

77.     Defendant Coye eventually put the C-Summons in Mr. Bhatia's backpack.

78.     Eventually, Defendants Coye and Bourne uncuffed Mr. Bhatia, instructed him to put his shoes back on, and escorted him out of the hotel.

79.     Mr. Bhatia asked Defendnats Coye and Bourne for their business cards, but they refused to provide them.

80.     At around 8:55PM, Mr. Bhatia left the hotel and walked the last few blocks home.

81.     Throughout the indoor encounter, Defendants Coye, Doe, 2, and Bourne detained Mr. Bhatia in a small, enclosed space, without their masks on, and having removed their masks.

82.     During his detention, Mr. Bhatia asked Defendants Coye and Bourne repeatedly why he was being detained and what he was being charged with, but they did not tell him.

83.     The C-Summons, which Defendant Coye swore out under penalties of perjury, charged Mr. Bhatia with a PL § 240.26(1) (Harassment in the Second Degree) violation.

84.     In the C-Summons, Defendant Coye swore that Mr. Bhatia "shout[ed] profanities" and "engag[ed] in threatening behavior" toward Defendant Coye and that "when [he] told" Mr. Bhatia to stop, Mr. Bhatia "refused."

85.     In the C-Summons, Defendant Coye also swore that Mr. Bhatia had stated: "Fuck you wear your mask I hate Trump fuck you."

86.     The C-Summons compelled Mr. Bhatia's attendance at New York City Criminal Court, Queens County, on November 9, 2020.

87.     At no time did Mr. Bhatia shout profanities at or engage in threatening behavior toward Defendant Coye.

88.     Defendant Coye did not tell Mr. Bhatia to stop shouting profanities or engaging in threatening behavior.

89.     At no time did Mr. Bhatia strike, shove, kick or otherwise contact Defendant Coye, or attempt or threaten to do so.

90.     At no time did Mr. Bhatia state "Fuck you wear your mask I hate Trump fuck you" or words to that effect to Defendant Coye.

91.     Defendants Coye, Bourne, and Diaz knew or should have known that the conduct Mr. Bhatia engaged in – taking photographs of, and talking with, a uniformed law enforcement officer conducting his duties in a public place, from a safe distance, without interfering with their performance of their duties – was not only legal, but also protected under the First Amendment to the United States Constitution and the attendant provisions of the New York State Constitution.

92.     Defendants Coye, Bourne, and Diaz knew or should have known that they lacked the authority to use force on or arrest Mr. Bhatia.

93.     Defendants Coye, Bourne, and Daiz knew or should have known that they lacked authority to detain, search, or charge Mr. Bhatia.

94.     Defendants Coye and Diaz knew or should have known that the allegations Defendant Coye made in the C-Summons about Mr. Bhatia's conduct were false.

95.     On July 12, 2020, Mr. Bhatia tweeted a thread about his experiences, which can be found here: https://twitter.com/bhatiadesign/status/1282507007556292611 (last accessed October 7, 2021).

96.     Mr. Bhatia's Twitter thread went viral.

97.     On July 20, 2020, counsel for Mr. Bhatia submitted to DHS a demand to preserve and produce security footage from outside the hotel.

98.     On July 22, 2020, counsel for Mr. Bhatia submitted a FOIL request to DHS seeking copies of the security footage related to Mr. Bhatia's arrest.

99.     Also on July 22, 2020, *Gothamist* reported on Mr. Bhatia's experiences. In that article, DHS is quoted as stating:

> "We are investigating these allegations, which are very troubling," a Department of Social Services/Department of Homeless Services spokesperson said. "If substantiated, we will not hesitate to take swift disciplinary action."

*See* Pereira, Sydney, "Homeless Services Cop Allegedly Cuffed And Detained Man For Photographing Him Without Mask." *Gothamist*, July 22, 2020. Available at https://gothamist.com/news/homeless-services-cop-detained-man-taking-photo-him-without-mask. Last accessed October 7, 2021.

100.    Upon information and belief, at some time between July 12, 2020 and July 23, 2020, DHS representatives contacted the New York City Criminal Court and requested that the C-Summons be rescinded.

101.    Upon information and belief, a New York City Criminal Court Assistant Deputy Chief Clerk subsequently confirmed that the summons had in fact been rescinded.

102.    According to a letter from the New York State Office of Court Administration, the summons Defendant Coye issued was dismissed on July 23, 2020 because, as of that date, Defendant Coye and/or DHS had "failed to file a legally acceptable accusatory instrument with" the Court.

103.    Upon information and belief, on July 24, 2020, DHS suspended Defendants Coye and Bourne for 30 days.

104.    On July 27, 2020, *Gothamist* reported that Defendants Coye and Bourne had been suspended for 30 days and that DHS would be "bringing charges that may result in" their termination:

> "As a result of our review of this incident, we have determined that the actions described, including unjustified detainment and false reporting of the incident to us by the officer, are an absolutely unacceptable abuse of authority and breach of trust, which we will not tolerate at our Agency," a DHS spokesperson said in a statement. "As a result, we are bringing charges that may result in the termination of the officers involved.".

> Bourne and Coye will be suspended without pay for 30 days, the department said. When they return, they'll be placed on modified duty while the agency pursues termination through charges pursuant to civil service and union rules.

> "Ensuring a safe, supportive environment for clients, staff, and community members alike, is our top priority as we help New Yorkers in need get back on their feet at our shelter locations," the DHS spokesperson said. "We are deeply sorry for the experience Mr Bhatia had to endure here."

> The department was unable to provide details on what its investigation found since it is an ongoing disciplinary matter, but a spokesperson said there was "no basis for detainment, there was no threat to or harassment of the officer."

*See* Pereira, Sydney, "Homeless Service Cops Suspended After Detaining Man Who Took Photo Of Officer Not Wearing Mask." *Gothamist*, July 27, 2020. Available at

https://gothamist.com/news/homeless-services-cops-suspended-after-detaining-man-who-took-photo-officer-not-wearing-mask. Last accessed October 7, 2021.

105.    On September 15, 2020, Maya Kaufman reported in *Patch* as follows:

> The officers, supervising officer Ian Bourne and officer Joseph Coye, have since returned to work but were reassigned to administrative positions. Meanwhile, the agency is in the process of filing disciplinary charges against them for violations of the Department of Homeless Services code of conduct, a spokesperson told Patch.

> Both officers are being charged with improper detainment of an individual and providing false statements, and Coye faces a charge of improper issuance of a summons, according to the spokesperson.

> The agency is still evaluating a third officer's role in the incident.

> "As we have said, the actions described, including unjustified detainment and false reporting of the incident to us by the officer, are an absolutely unacceptable abuse of authority and breach of trust, which we will not tolerate at our agency," NYC Department of Social Services spokesperson Isaac McGinn said in an emailed statement. "We are bringing charges that may result in the termination of the officers involved."

> The Department of Social Services has forwarded information on the administrative charges to the Queens District Attorney's Office, setting the stage for prosecutors to bring their own charges if they choose.

*See* Kaufman, Maya. "WATCH: Homeless Services Cops Cuff LIC Man Who Photographed Them." *Patch*, September 15, 2020. Available at https://patch.com/new-york/astoria-long-island-city/watch-homeless-services-cops-cuff-lic-man-who-photographed-them. Last accessed October 8, 2021.

106.     Upon information and belief, DHS policies prohibited Defendants Coye, Bourne, and Diaz from recording false information in official DHS reports.

107.     However, each of Defendants Coye, Bourne, and Diaz created official DHS reports that included false information related to their interactions with and treatment of Mr. Bhatia.

108.     For example, Defendant Coye swore out the C-Summons under Defendant Diaz's supervision and submitted the C-Summons to the New York City Criminal Court, initiating a criminal prosecution against Mr. Bhatia based on false information.

109.     By way of additional example, on or about July 12, 2020, Defendant Coye created a DHS Police Service Report regarding the incident involving alleged "Threat – Harassment" that identifies Defendant Diaz as the DHS Duty Supervisor who was "notified" of the incident. The "DETAILS" section of the report states:

> At TPO civilian Anshuman Bhatia approached DHSP Officer Coye 698 and started to take pictures of officer face. When asked to step back he refused Mr. Bhatia then approached Officer Bourne #615 aggressively putting phone in his face taking pictures. Mr. Bhatia was asked to step back again he refused and began shouting threats and profanities at officers. Mr Bhatia was then detained escorted to command issued a summons #4447392242 by Officer Coye for harassment. Warrant check was conducted with negative results. Mr. Bhatia was released and escorted out of DHS facility.

110.     In a July 21, 2020 written statement directed to DHS Deputy Inspector David Eddie, Defendant Coye stated:

> On July 12th 2020 at approx. 2000hrs while standing I/F/O 23-15 39th Ave, LIC Queens 11101, PO Coye 698 was approached by an unknown civilian who started to take pictures of me while shouting threats. Statements yelled were about being a Trump supporter and about me not wearing my mask. IU asked said individual to refrain from making threats and to step back. Instead of stepping back he then approached PO Bourns 615 and started yelling profanities and threats while taking more pictures. I, PO Coye then detained said individual and escorted him to DHS Police command. A/T/T Lt. Diaz was notified of individual's actions. As per Lt. Diaz a summons for

Harassment was to be issued. Warrant check wa conducted with negative results. Also a search of said individual was conducted which yielded a 12 pack of beer and bike tools. All items were returned to said individual after he was issued the summons. Said individual was escorted out of the building by Lt. Diaz and myself PO Coye with no further incident.

111.    In a July 21, 2020 written statement directed to DHS DI Eddie, Defendant Bourne

stated:

On July 12th 23020 at approx. 2000hrs while returning to search from a 62 I, PO Bourne 615 overheard a disturbance I/F/O. PO Coye 698 was not at search so I proceeded outside after asking security personnel to hold down search. As I walked up the stairs I observed a white male yelling threats at PO Coye while recording him. AT this moment I was unaware of why said individual was yelling threats at PO Coye nor why he was recording him while making these threats however before I, PO Bourne could inquire on what was taking place the same individual turned and started to yell at me about not wearing a mask. Prior tro his yelling at me I was in process of placing my mask over my face. Said individual then started to make. Threats towards me, at which time he was detained by PO Coye and myself, PO Bourne then brought into the building. I remained at search while PO Coye took said individual was taken to DHS command located on the 2nd floor. Upon said individual leaving the building I was informed that he was issued a summons for harassment 2nd degree and was in possession of alcohol.

112.    In a July 23, 2020 written statement directed to DHS DI Eddie, Defendant Diaz

stated:

On 7/12/20 during the 4x12 tour at the above stated location, Po Coye #698 advised me via his portable radio that he had taken a person into custody & was enroute to command. Upon further questioning by me of Po Coye, he stated an unknown male had approached him aggressively, making threats & screaming at him apparently about his facemask. Po Coye then stated this male had put his phone in Po Coye's face while continuing to scream at him. Po Coye stated he asked the man to step back but he refused to stop his actions. Upon me interviewing Po Bourne #615, he stated to me at some point during this incident he came outside from access control to find the reason for the commotion. The male that was screaming threats at Po Coye, then proceeded to scream threats & profanities at Po Bourne as well, while stepping towards him. According to the officers, it was at this moment that they restrained & rear cuffed the male. When the male was brought to our DHS command on the 2nd floor of the facility, he was searched thoroughly, as was his book bag. There were  several cans of beer in the bag as well as metal tools that could have potentially been used at weapons. The client continued

to yell at Po Coye as he was searched. The client was issued a summons for Harassment 2nd Degree for his repeated actions of cursing, threatening & approaching officers which caused them to be alarmed. He was then escorted out of the facility with his bag & all of its contents without further incident.

113.    Upon information and belief, DHS received a complaint regarding Mr. Bhatia's treatment on July 14, 2020.

114.    Upon information and belief, on July 20, 2020, DHS Assistant Commissioner James Russo forwarded a complaint to DHSPD Deputy Inspector David Eddie for further investigation related to Mr. Bhatia's treatment at the hands of Defendants Coye, Bourne, and Diaz.

115.    Upon information and belief, as a result of the complaint that AC Russo forwarded to DI Eddie, DHS Peace Officer FNY Rodriguez #522 investigated an excessive force complaint against Defendant Coye, and DI Eddie investigated a failure to supervise complaint against Defendant Diaz.

116.    Officer Rodriguez summarized his investigation related to Defendant Coye in a July 20, 2020 memo to AC Russo.

117.    According to Officer Rodriguez's memo, he interviewed Defendant Coye, who informed him that Mr. Bhatia "was taking [a] picture of his face and asking him why he [was] not wearing a face mask?" after which Coye "gave him a directive to top taking picture of him" and "when Mr. Bhatia refused to stop" Coye "decide to rear handcuff[] Mr. Bhatia and detained him."

118.    According to Officer Rodriguez's memo, he observed video surveillance that showed Defendant Coye escorting Mr. Bhatia "to DHS command", shackling Mr. Bhatia's leg to the bench, physically searching him, taking Mr. Bhatia's cell phone, attempting to unlock it by

trying to use Mr. Bhatia's face, and issuing Mr. Bhatia a summons, before Defendant Diaz

escorted Mr. Bhatia from the building.

119.     Officer Rodriguez's memo made as "INVESTIGATION FINDINGS" that:

    a.   Defendant Coye had "initiated the confrontation by making first contact with
         Mr. Bhatia by telling him that he was being detained and rear handcuffing for
         taking pictures and allegedly threating DHS Officers";

    b.   Defendant Coye "had no legal authority to detain Mr. Bhatia and or use any
         physical force to detain him"; and

    c.   Defendant Coye "is captured on video taking possession of Mr. Bhatia['s]
         cellphone and attempting to unlock the cellphone by trying to take a face
         recognition picture while being detained."

120.     Officer Rodriguez recommended that allegations of Unlawful Detention,

Excessive Force, and Failure to Safeguard Property against Defendant Coye should be "closed

SUBSTANTIATED."

121.     DI Eddie summarized his investigation related to Defendant Diaz in a July 20,

2020 memo to AC Russo.

122.     According to DI Eddie's memo, he interviewed Defendant Coye, who informed

him that Mr. Bhatia "was taking [a] picture of his face and asking him why he [was] not wearing

a face mask?" after which Coye "gave him a directive to top taking picture of him" and "when

Mr. Bhatia refused to stop" Coye and Bourne both "decide[d] to rearcuff[] Mr. Bhatia and

detained him" and "Lt. Diaz [later] gave him a directive to issue a harassment 2 degree

summon[s] to Mr. Bhatia."

123.     According to DI Eddie's memo, he interviewed Defendant Diaz, who stated that

he had "instructed" Defendant Coye "to issue the harassment 2 degree" C-Summons to Mr.

Bhatia.

124.     DI Eddie's memo made as "INVESTIGATION FINDINGS" that:

a. "The investigation was able to determine that" Defendant Diaz "fail[ed] to properly supervise" Defendant Coye "by directing [him] to issue Mr. Bhatia a harassment 2 degreee summon[s]";

b. Defendant Diaz "fail[ed] to understand that his action le[]d to an unauthorize[d] detainment and had no legal authority to detain Mr. Bhatia and or use any physical force to detain him"; and

c. Defendant Diaz "also fail][ed] to properly conduct an investigation by viewing cctv and properly interviewing his officer and Mr. Bhatia."

125.     DI Eddie recommended that allegations of Excessive Force against Defendant Coye should be "closed SUBSTANTIATED."

126.     Neither Officer Rodriguez's memo or DI Eddie's memo mentioned or recommended charges against Defendants Bourne or Diaz.

127.     Upon information and belief, as a result of those investigations, DHS determined to bring charges against Defendants Coye and Bourne.

128.     On July 23, 2020, DHS immediately suspended Defendant Bourne immediately for thirty days pending the disposition of the disciplinary proceeding regarding the charges that were to be brought against him.

129.     On July 24, 2020, DHS immediately suspended Defendant Coye immediately for thirty days pending the disposition of the disciplinary proceeding regarding the charges that were to be brought against him.

130.     DHS subsequently lodged written charges and specifications against Defendants Coye and Bourne.

131.     According to the specifications against Defendant Coye:

**SPECIFICATION I:**

On or about July 12, 2020, at approximately 8:10 pm, you abandoned your post inside of the lobby of the Myrtle Men's Shelter and went outside to the main entrance of the facility. Further, you were <u>not</u> wearing a face

mask at the time although you were in a busy public area where individuals were passing by on the sidewalk and entering into the facility, in violation of the New York State mandate in effect at the time, and Agency directive.

At approximately 8:16 pm, civilian A.B. passed by the sidewalk outside of the facility and observed that you were not wearing a mask. A.B. pointed this out to you and purportedly captured this on his cell phone. Instead of de-escalating the matter or returning to your post, you engaged in a back-and-forth exchange. CCTV footage reflected that A.B. maintained a distance of several feet from you throughout the duration of your exchange. Subsequently, Special Officer Ian Bourne exited the facility and A.B. pointed out that he too, was not wearing a mask, so he proceeded to take his picture, though he did not approach Officer Bourne. As a result, you elected to approach A.B., improperly handcuffed him with the assistance of Officer Bourne, and escorted him into the facility for further detainment, without proper justification.

You brought A.B. to a second-floor small room, where he was detained for at least 35 minutes. During that time, you cuffed his left leg to a chair and rear-cuffed his hands while searching his backpack and personal belongings. Furthermore, while mA.B. was rear-cuffed, you took his mobile phone and made unauthorized attempts to unlock his phone by forcibly removing A.B.'s mask so that you could try to use the facial recognition feature of the phone. In addition, you made discourteous and inappropriate remarks to A.B. during the time that he was detained.

Finally, you improperly issued A.B. a criminal summons for Harassment in the 2nd Degree, on the basis that he behaved in a harassing and/or threatening manner to you and Officer Bourne during your initial encounter. However, based on the foregoing, you unlawfully arrested and detained A.B. for his actions, when you had no probable cause or legal justification to do so. …

## SPECIFICATION II:

Following your improper arrest of A.B., described in Specification I, above, you made several false statements concerning your interaction with A.B., to justify the arrest and summons. Your statements were underlined contradicted by the video footage of the incident, which reflects that A.B. remained several feet away from you during the entire exchange and never approached you or Officer Bourne in a threatening manner, as alleged. Rather, the video footage captured that it was you who approached A.B. during the exchange, contrary to your statements.

- First, on or about <u>July 12, 2020</u>, in speaking with your supervising officer Lieutenant ("Lt.") Robert Diaz, you attempted to justify A.B.'s detainment by falsely stating that he had approached you aggressively, making threats and screaming, while putting his phone in your face. Further, you indicated to Lt. Diaz that A.B. then started to approach Officer Bourne, while making threatening remarks and putting his phone in Officer Bourne's face. In addition, in the Police Service Report you prepared on or about the same date, you falsely wrote the same things to describe the incident.

- Second, on or about <u>July 21, 2020</u>, you prepared a written statement to justify the summons you issued to A.B., falsely stating that A.B. had approached you and started yelling threats, and that he then approached Officer Bourne while yelling profanities and threats.

132.    According to the charges against Defendant Coye, that behavior violated 19 separate DHS rules and policies, including, but not limited to:

a.   New York State Executive Orders 202.16 and 202.17 and DHS policy that required Defendant Coye to wear a mask on July 12, 2020;

b.   New York State's "New Yorker's Right to Monitor Act" "which requires that officers allow people to record them in public as long as they do not interfere with the officer";

c.   Four separate provisions of the DHS Code of Conduct and DHS Peace Officer Guide requiring "courteous and considerate" behavior in contact with the public and prohibiting conduct "prejudicial to good order, efficiency or discipline of the agency";

d.   Two separate provisions of the DHS Peace Officer Guide relating to use of force and prohibiting the use of excessive force;

e.   A provision of the DHS Peace Officer Guide prohibiting the use of "discourteous or disrespectful remarks regarding any person's ethnicity, race, gender or sexual orientation";

f.   Two separate provisions of the DHS Code of Conduct and DHS Peace Officer Guide prohibiting knowingly and intentionally making false statements;

g.   A provision of the DHS Code of Conduct that prohibits knowingly making false entries on City or Agency records or submitting false documents;

h. A provision of the DHS Code of Conduct prohibiting "official misconduct" – committing an act relating to their office that is an unauthorized exercise of an official function while knowing that the act is unauthorized;

i. A provision of the DHS Peace Officer Guide regarding the requirements to safeguard property;

j. New York State Penal Law Section 156.05 – Unauthorized Use of a Computer – prohibiting knowing use of or accessing a computer or computer service without authorization; and

k. A provision of the DHS Peace Officer Guide that requires DHS Special Officers should only make arrests when they have probable cause.

133. In a Stipulation of Settlement fully executed on March 25, 2021 related to the disciplinary charges DHS brought against Defendant Coye, among other things, Defendant Coye agreed to resign from his employment on or before March 31, 2021, and not attempt to return to work or seek employment with DHS in the future.

134. According to the specifications against Defendant Bourne:

**SPECIFICATION I:**

On or about July 12, 2020, at approximately 8:16 pm, you abandoned your post inside of the lobby of the Myrtle Men's Shelter and went outside to the main entrance of the facility, despite not being on a designated break at the time. Further, you were <u>not</u> wearing a face mask at the time although you were in a busy public area where individuals were passing by on the sidewalk and entering into the facility, in violation of the New York State mandate in effect at the time, and Agency directive.

Upon exiting the facility, civilian A.B. was engaged in a back-and forth exchange with Special Officer Joseph Coye regarding his not wearing a mask. Upon seeing that you also were not wearing a mask, A.B. pointed this out to you and purportedly captured this on his cell phone. Only then did you proceed to put on a mask. A.B. did not make any threatening gestures or approach you during his exchange. However, you joined Officer Coye in handcuffing A.B. and detaining him without proper justification.

During the course of the detainment, and despite the lack of struggle or resistance from A.B. during this process, you forcibly lifted A.B.'s left arm behind him very high above his head in an unnatural manner, causing him to hunch forward and put his head down, which is not a part of DHS training or protocol. You and Officer Coye then escorted him into the facility for further detainment.

**....**

**SPECIFICATION II:**

Following your improper arrest of A.B., described in Specification I, above, you made false verbal and written statements concerning your interaction with A.B., to justify his arrest and summons issuance (issued for Harassment in the Second Degree). Your statements were <u>contradicted</u> by the video footage of the incident, which reflects that A.B. remained several feet away from you and Officer Coye during the entire exchange and never approached either of you in a threatening manner, as you alleged in your statements. Your false statements are as follows:

- First, on or about <u>July 12, 2020</u>, in speaking with your supervising officer Lieutenant ("Lt.") Robert Diaz, you attempted to justify A.B.'s detainment by falsely stating that you came outside from access control to find A.B. screaming threats at Officer Coye, and that he then proceeded to scream threats at you, while stepping towards you.

- Second, on or about <u>July 21, 2020</u>, you made an additional written statement to justify the detainment, in which you exaggerated A.B.'s actions. In this statement you wrote that upon exiting the facility you *"observed a white male yelling threats at P.O. Coye while recording him...."* You wrote that A.B. then started yelling and started making threats towards you, at which time he was detained.

135.    According to the charges against Defendant Bourne, that behavior violated 16

separate DHS rules and policies, including, but not limited to:

a.    New York State Executive Orders 202.16 and 202.17 and DHS policy that required Defendant Coye to wear a mask on July 12, 2020;

b.    New York State's "New Yorker's Right to Monitor Act" "which requires that officers allow people to record them in public as long as they do not interfere with the officer";

c.    Four separate provisions of the DHS Code of Conduct and DHS Peace Officer Guide requiring "courteous and considerate" behavior in contact with the public and prohibiting conduct "prejudicial to good order, efficiency or discipline of the agency";

d.    Two separate provisions of the DHS Peace Officer Guide relating to use of force and prohibiting the use of excessive force;

 e. Two separate provisions of the DHS Code of Conduct and DHS Peace Officer Guide prohibiting knowingly and intentionally making false statements;

 f. A provision of the DHS Code of Conduct that prohibits knowingly making false entries on City or Agency records or submitting false documents;

 g. A provision of the DHS Code of Conduct prohibiting "official misconduct" – committing an act relating to their office that is an unauthorized exercise of an official function while knowing that the act is unauthorized; and

 h. A provision of the DHS Peace Officer Guide that requires DHS Special Officers should only make arrests when they have probable cause.

136. Upon information and belief, as of April 23, 2021, Defendant Bourne had his first step disciplinary hearing and was pending a hearing at the New York City Office of Administrative Trials and Hearings or arbitration.

137. It appears that DHS has not brought charges against Defendant Diaz.

138. Upon information and belief, Defendant City has not taken any action against Defendant Diaz related to his involvement in, or failures to intervene in connection with, detaining, arresting, or prosecuting Mr. Bhatia.

139. Before the July 2020 incident involving Plaintiff Bhatia, Defendant Coye had been subject to charges and specifications at least three prior times during his career with DHS – most recently in 2019.

140. In the first incident, which involved allegations of 28 instances of lateness with a cumulative missed 22 hours over a one-year period ending in 2017 and 18 instances of absences for a cumulative total of more than 181 hours absent over a one-year period ending in 2017, Defendant Coye was charged with five violations of DHS rules related to unauthorized lateness and absences.

141. In August of 2017, pursuant to a stipulated settlement, Defendant Coye accepted a penalty of 15 calendar days' suspension without pay related to that incident.

142.     In the second incident, which involved allegations of 7 instances of lateness with a cumulative missed 2 hours and 52 minutes over an around 4-month period in 2017, 11 instances of absences for a cumulative total of more than 76 hours absent over a roughly 4-month period in 2017, and numerous charges of failing to follow DHS call-out procedures related to absences, Defendant Coye was charged with seven violations of DHS rules, including charges related to unauthorized lateness and absences, as well as charges related to failing to obey lawful orders and instructions of supervisory officers.

143.     In March of 2018, pursuant to a stipulated settlement, Defendant Coye accepted a 20-day penalty, involving an eight work day suspension to be followed by a 12-day suspension to be held in abeyance for a period of one year, until February 5, 2019, to be imposed if allegations against Defendant Coye were sustained that he had committed misconduct in violation of the same policies charged in the second incident.

144.     The third incident involved allegations that Defendant Coye used excessive force against a DHS client on March 25, 2019. The allegations were as follows:

> At approximately 10:00 a.m., the client exited a stairwell and entered the hallway where Command is located. The client then became involved in a verbal altercation with an officer who was standing  inside the entryway of Command. As the client spoke to the officer, you walked up the hallway, stopping once you were outside the entryway of Command, which is where the client was standing. After being told to leave by the officer, the client began walking down the hallway. You immediately turned and followed the client. As the client was walking you used both of your hands to push the client's back and shove him forward through a doorway. You then shoved the client out of the doorway and into another hall. The client continued walking down the hallway with you following him. As you were walking, you snatched the client's bandana off of his head. Once you and the client reached the end of the second hallway, you shoved the client for a third time through  another doorway before  following him. Although  the  client had  made  several inappropriate comments and had directed  verbal threats towards you and the other officer, the client did not use or attempt to use force against you or adopt a hostile or threatening posture. Accordingly, your use of force against the client was inappropriate.

Furthermore, in a memorandum dated March 25, 2019, you wrote that you used force against the client to prevent him from fleeing the building. However, the CCTV footage of the incident does not support your claim that the client was attempting to flee.

145.    As a result, Defendant Coye was charged with eight violations of DHS policies, including prohibitions on the use of excessive force and unlawfully restraining individuals.

146.    In September of 2016, pursuant to a stipulated settlement, Defendant Coye accepted another 20-day penalty, involving a ten work day suspension to be followed by a 10-day suspension held in abeyance for a period of six months, beginning August 27, 2019, for similar misconduct.

147.    The force Defendants Coye and Bourne used on Mr. Bhatia in arresting and handcuffing him tightly caused Mr. Bhatia to experience pain in his left shoulder and both wrists.

148.    As a result of Mr. Bhatia's experiences at the Individual Defendants' hands, Mr. Bhatia has experienced increased fear and worry about his interactions with police, among other injuries.

149.    The Office of the Queens County District Attorney (the "QCDA" or "QCDA's Office") is aware of Defendants Coye's and Bourne's serious, criminal conduct related to Mr. Bhatia, including their roles in assaulting, battering, falsely arresting, improperly searching, and maliciously charging Mr. Bhatia based on false – including falsely sworn – statements on July 12, 2020.

150.    DHS reported and attempted to refer Defendants Coye's and Bourne's misconduct to the QCDA's Office.

151.    On July 28, 2020, a representative from the QCDA's Law Enforcement Officer Witness ("LEOW") unit e-mailed DHS to inform DHS that the QCDA had "recently [become] aware that" Defendants Coye and Bourne "detained a man who photographed them for not

wearing masks" and that "DHS ha[d] disciplined them and [was] looking to fire them" and that the QCDA was requesting "more information …so that" QCDA could "create a disclosure letter" for Defendants Coye and Bourne.

152.    On July 29, 2020, when DHS responded to find out if QCDA was seeking to prosecute Defendants Coye and Bourne, QCDA responded that its inquiry was "not about prosecuting the officers" but rather "just to see if [DHS] had anything to add on the information in the [*Gothamist*] article and whether the charges were substantiated" so QCDA could "update the information" in their LEOW unit maintains.

153.    On September 17, 2020, DHS Deputy General Counsel again e-mailed the QCDA, including copies of the C-Summons and DHS's previous correspondence with the QCDA, as well as the DHS charges against Defendants Coye and Bourne and supporting materials.

154.    Upon information and belief, the QCDA has failed to take any action related to Defendants Coye's, Bourne's, or Diaz's illegal and criminal mistreatment of Mr. Bhatia on July 12, 2020 and multiple false statements made in official documents in attempts to cover it up.

155.    Therefore, Mr. Bhatia now brings suit seeking money damages, attorney's fees, costs and expenses, as well as a declaratory judgment designed to prevent Defendants from violating Plaintiff's rights, and the rights of others who interact with DHS police, including those who wish to observe and document DHS police activities in New York City public spaces, in the future.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

**Against Defendants Coye, Bourne, and Diaz**

156.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

157.    Defendants did not have probable cause to seize, detain, or arrest Plaintiff.

158.    Defendants seized Plaintiff without a written judicial warrant authorizing them to do so.

159.    Defendants' seizure of Plaintiff was without privilege or lawful justification.

160.    Plaintiff did not consent and was conscious of the confinement by Defendants.

161.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

162.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

**Excessive Force**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***
**Against Defendants Coye and Bourne**

163.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

164.    Defendants' uses of force against Plaintiff were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

165.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of

Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and

expenses; and/or otherwise damaged and injured Plaintiff.

166.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless,

and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

**For Violations of Plaintiff's First Amendment Rights,
Including Under Retaliation and Time/Place/Manner Theories of Liability
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First
and Fourteenth Amendments to the United States Constitution*
Against Defendants Coye, Bourne, and Diaz**

167.     Plaintiff incorporates by reference the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

168.     Defendants retaliated against Plaintiff for engaging in speech and/or conduct

protected by the First Amendment.

169.     Defendants engaged in the acts and omissions complained of herein in retaliation

for Plaintiff's protected speech and/or conduct.

170.     Defendants engaged in the acts and omissions complained of herein in order to

prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

171.     Defendants engaged in the acts and omissions complained of herein in order to

prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

172.     Upon information and belief, Defendants engaged in the acts and omissions

complained of herein with respect to Plaintiff's First Amendment-based claims—including the

related municipal liability claims involving the adoption or implementation of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

173.    Defendants imposed restrictions on Plaintiff's protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in subjecting Plaintiff to excessive force, false arrest and detention, malicious and false prosecution, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

174.    In addition to being retaliatory, the restrictions Plaintiff complained of herein that Defendants imposed on Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiff's protected conduct that:

   a.   Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

   b.   Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

   c.   Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's ability to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

   d.   Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

175.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

176.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FOURTH CLAIM FOR RELIEF

**Deprivation of Fair Trial Rights**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitutions***
**Against Defendants Coye and Diaz**

177.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

178.    Defendants Coye and Diaz fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiff suffered liberty deprivations and other injuries.

179.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

180.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FIFTH CLAIM FOR RELIEF

**Malicious Prosecution**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution***

**Against Defendants Coye and Diaz**

181.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

182.    Defendants Coye and Diaz misrepresented and falsified evidence and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence.

183.    Defendants Coye and Diaz were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiff, including by supplying and creating false information to be included in police paperwork that was included in police paperwork and providing falsely sworn information in accusatory instruments.

184.    Defendants Coye and Diaz lacked probable cause to initiate and continue criminal proceedings against Plaintiff.

185.    Defendants Coye and Diaz acted with malice in initiating criminal proceedings against Plaintiff.

186.    Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiff were favorably terminated on the merits.

187.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

188.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## <u>SIXTH CLAIM FOR RELIEF</u>

**Municipal Liability**
*Pursuant to 42 U.S.C. 1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978)*
*for Defendants' Violations of Plaintiff's Rights Under the United States Constitution*
**Against Defendant City of New York**

206.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

207.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff to, including, but not limited to: uses of excessive force, false arrest, unreasonable restrictions on Plaintiff's First Amendment-protected conduct, and false and malicious prosecution.

208.    All of the wrongful acts or omissions complained of herein were carried out by the Individual Defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents; (c) customs, practices, and usage of the Cty that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, Fifth, Sixth, and/or Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline DHS officers, despite full knowledge of the officers' wrongful acts, as described herein.

209.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

**<u>SEVENTH CLAIM FOR RELIEF</u>**

## Violations of New York State Law
### *Pursuant to the New York State Constitution and New York State Law*
## Against All Defendants

210.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

### *Respondeat Superior* **Liability**

211.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

### Assault

212.    Defendants committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

### Battery

213.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

### New York Civil Rights Law § 79-P

214.    Prior to Plaintiff's assault, battery, and arrest, Plaintiff had been exercising his rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity and to maintain custody and control over the notes in which he was doing so.

215.    Plaintiff had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

216.    Defendants assaulted and battered and arrested Plaintiff, seizing his phone, intentionally preventing him from further recording law enforcement activity.

**Conversion**

217.    Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiff's personal property in derogation of Plaintiff's rights.

**False Imprisonment and Unreasonable Detention**

218.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so.

219.    Plaintiff was conscious of the confinement and it was without Plaintiff's consent.

**Negligent Hiring, Training and Supervision**

220.    Upon information and belief, Defendant City negligently hired, supervised, and trained the police officials described above.

**Violations of the New York State Constitution**

221.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

222.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

223.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

224.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

i.      Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.     Actual damages in an amount to be determined at trial against the City of New York;

iii.    Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, New York Civil Rights Law § 79-P(3)(d), and New York common law;

iv.     A declaratory judgment regarding Defendants' violations of Plaintiff's rights; and

v.      Such other relief as the Court deems just and proper.

Dated: New York, New York
      October 10, 2021

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com